DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
           v.                      )     Criminal No. 2014-42
                                   )
KUAUMI K. JN BAPTISTE,             )
                                   )
                Defendant.         )
_____   )

ATTORNEYS:

**Ronald Sharpe, USA**
**Ishmael Meyers, Jr. AUSA**
St. Thomas, U.S.V.I.
      *For the plaintiff,*

**Omodare B. Jupiter, FPD**
St. Croix, U.S.V.I.
**Gabriel J. Villegas, AFPD**
St. Thomas, U.S.V.I.
Office of the Federal Public Defender
      *For the defendant Kuaumi Jn Baptiste.*


## ORDER

Before the Court is the motion of defendant Kuami K. Jn-Baptiste to suppress evidence.

### I.   FACTUAL AND PROCEDURAL HISTORY

St. John, United States Virgin Islands, held its annual Carnival during the week of July 4, 3014. St. John Carnival is a festival in which a large number of people celebrate primarily in and around Cruz Bay on St. John. During Carnival, a task force was set up to investigate the possible illegal sale of

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 2

narcotics.  Richard Dominguez ("Dominguez"), a member of the Virgin Islands Police Department assigned to a DEA drug task-force, was on St. John in the performance of his duties. Dominguez received information from the management at "The Across The Street Bar and Grill" (the "Bar & Grill"), located near Cruz Bay, that possible narcotics sales had occurred on their deck area during non-business hours. The management stated it had found drug paraphernalia that had appeared on the deck of the Bar & Grill between closing and opening.

In the evening, Dominguez began conducting surveillance of the Bar & Grill. He conducted this surveillance by positioning himself across the street from the Bar & Grill. The Bar & Grill has an outdoor deck, which is accessible even when the Bar & Grill is closed.  The deck has two entrances, one at the front and one at the back.

While surveiling the Bar & Grill, Dominguez observed defendant Kuami Jn-Baptiste ("Jn-Baptiste") on the deck of the Bar & Grill. Different individuals approached Jn-Baptiste. Jn-Baptiste and these individuals then engaged in "multiple quick hand to hand transactions." Dominguez stated that such hand-to-hand transactions are indicative of narcotics sales. Dominguez did not see any drugs passing between individuals, but did see money being passed from the individuals approaching Jn-Baptiste

to Jn-Baptiste. Jn-Baptiste and these individuals seemed to be
conducting what Dominguez called "countersurveillance," making
sure there were no police officers nearby. Dominguez also noted
Jn-Baptiste backing into the shadows on the deck of the Bar &
Grill when police were visible.

Dominguez called the Virgin Islands Police Department's
Special Operations Unit Field Team ("VIPD") to investigate what
he observed. VIPD entered through the front entrance to the deck
and through the back entrance of the deck. When VIPD arrived,
Jn-Baptiste became visibly alarmed, and attempted to leave. Jn-
Baptiste tried to jump over the railing of the deck, but was
stopped by officers approaching through the back entrance.

Officers blocked Jn-Baptiste's path, and Officer Jaime
Serrano ("Serrano") initiated a "pat-down" or "frisk" of Jn-
Baptiste's clothing and person. Serrano stated that the pat-down
was conducted in order to determine if Jn-Baptiste was armed.
During the pat-down, Serrano discovered a "large softball size"
lump in the pocket of Jn-Baptiste's cargo shorts. Serrano
testified at first that he felt "a hard bulge. It wasn't a
normal shape.  Just felt like a hard bulge in his pocket."
(Hearing Tr. p. 45) Serrano later said that the lump was "soft,"
referring to the texture of the cloth. (*Id.* at 46.) Serrano
stated that though the lump was "soft," he could not feel

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 4

through it to determine if a weapon, like a knife or razor
blade, was contained therein. (*Id.*) Officers removed the lump,
and found a multi-colored zippered pouch. The pouch was not
transparent. Serrano opened the pouch, he says to check for
weapons, and found several zip lock bags of what appeared to be
marijuana. The substance later field tested positive for
marijuana.

Upon finding the marijuana, Jn-Baptiste was arrested.
Following his arrest, Jn-Baptiste was more thoroughly searched.
During this second search, Serrano found a black coin purse.
Serrano opened the coin purse, and discovered it contained small
bags of a substance that field-tested positive for cocaine. Jn-
Baptiste was also found to have hundreds of dollars in cash.

Jn-Baptiste was indicted in this matter on September 11,
2014. The indictment charges Jn-Baptiste with four counts: (1)
possession with intent to distribute narcotics within one
thousand feet of a school (cocaine base); (2) possession with
intent to distribute narcotics within one thousand feet of a
school (marijuana); (3) possession with intent to distribute
narcotics (cocaine base); and (4) possession with intent to
distribute narcotics (marijuana). Thereafter, Jn-Baptiste moved
to suppress all the evidence that was taken from his person.

Jn-Baptiste argues first that stopping him constituted an impermissible seizure of his person, because there was no reasonable suspicion to justify the stop. Jn-Baptiste then argues that the officers lacked reasonable suspicion that he was armed, such that a pat-down was merited. Finally, Jn-Baptiste also argues that the search of the multi-colored pouch exceeded the bounds of a permissible frisk. Jn-Baptiste also seeks exclusion of the cocaine as fruit of the poisonous tree. The Court held a hearing on Jn-Baptiste's motion to suppress, and took the motion under advisement.

## II.  <u>DISCUSSION</u>

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

U.S. Const. Amend. IV.  "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing.  While such suspicion is not an 'irreducible' component of reasonableness, [the Supreme Court has] recognized only limited circumstances in which the usual rule does not apply."  *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000);

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 6

*United States v. Hartwell*, 436 F.3d 174, 178 (3d Cir.), *cert.*

*denied*, 549 U.S. 945 (2006).

The level of individualized suspicion required depends upon "balancing the need to search (or seize) against the invasion which the search (or seizure) entails." *Terry v. Ohio*, 392 U.S. 1, 21 (1968)(internal quotation omitted). "And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id*.

## III. <u>ANALYSIS</u>

The Court's Fourth Amendment analysis proceeds in three stages. "First [the Court] ask[s] whether a Fourth Amendment event, such as a search or seizure has occurred. Next, [it] consider[s] whether that search or seizure was reasonable. If it was not, [the Court] then determine[s] whether the circumstances warrant suppression of the evidence." *United States v. Dupre*e, 617 F.3d 724, 730 (3d Cir. 2010) (citation omitted).

A seizure occurs only "when [a law enforcement officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009)(quoting *Terry v. Ohio,* 392 U.S.

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 7

1,19-20 n.16 (1968). The "show of authority" test "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person" in light of all the surrounding circumstances. *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009)(quoting *Terry v. Ohio,* 392 U.S. 1,19-20 n.16 (1968).

In this case, Dominguez testified that Jn-Baptiste was stopped by officers as Jn-Baptiste attempted to leave.  Jn-Baptiste was then surrounded by VIPD officers, who had entered from both sides of the deck. The officers prevented his attempts to leave the area.  It is clear that the officers "restrain[ed] the freedom of a person to walk away." *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). As such, the stop constituted a seizure under the Fourth Amendment.

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 8

requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "In determining whether an officer had reasonable suspicion to justify a Terry stop . . . the officer's subjective motives do not enter into the decisional calculus." *United States v. Romain*, 393 F.3d 63, 74 (1st Cir. 2004).

In considering whether, given the totality of the circumstances, an objectively reasonable police officer would have had reasonable suspicion that criminal activity was afoot, courts have considered, inter alia: tips from other people; whether the area in which the defendant was found is a high-crime area; nervous, evasive behaviors; flight from the police; hand-to-hand transactions; and lateness of the hour. *See, e.g.*, *Wardlow*, 528 U.S. at 119 (considering that the defendant was in a high crime neighborhood, and exhibited evasive behaviors); *United States v. Garvin*, 548 F. App'x 757, 760-61 (3d Cir. 2013)(considering a tip from an informant, lateness of the hour, and flight from the police); *United States v. Lopez*, 441 F. App'x 910, 913-14 (3d Cir. 2011)(considering a high-crime area, lateness of the hour, and hand-to-hand transactions).

In *United States v. Lopez*, 441 F. App'x 910 (3d Cir. 2013), "[t]he officers, while working a nighttime shift, observed Martin, Rogelio, and Zuniga exit their vehicles in an isolated

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 9

section of an otherwise empty parking lot. The men walked toward each other while continually surveying their surroundings, and the officers saw them exchange a small article without first shaking hands. The officers knew that the area around the parking was a high-crime area, and they suspected that they had just witnessed a hand-to-hand narcotics transaction." *Lopez*, 441 F. App'x at 913. The Third Circuit found that the District Court had not erred

> in holding that these circumstances gave rise to an inference of drug-related activity and, thus, that the officers properly detained defendants for the purpose of conducting a Terry stop. Though presence in a high-crime area and the lateness of the hour do not, without more, give rise to reasonable suspicion, they may be considered in the totality of the circumstances. These factors, when combined with the behavior that the officers observed, amount to a totality of circumstances that supports the officers' reasonable suspicion.

*Id.* at 913-14.

Rodriguez testified at the hearing that over the course of a year the owner of the Bar & Grill had complained of finding drug paraphernalia on his deck. Rodriguez further testified that, on the date in question, he began paying attention to Jn-Baptiste around midnight. (Hearing Tr. p. 7.) In his observations, people would approach Jn-Baptiste, and Jn-Baptiste and the other person would speak briefly. (*Id.* p. 11.) Jn-

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 10

Baptiste and the other individuals appeared to be on the lookout for police presence. (*Id.* p. 10.) Jn-Baptiste and the individual would then engage in a hand-to-hand transaction. (*Id.* p. 10-11.) Rodriguez stated that in an hour or hour and a half time frame, he witnessed Jn-Baptiste engage in these behaviors "about ten times[.]" (*Id.* at 12.) These activities were, in Dominguez's experience, indicative of drug transactions. (*Id.* at 11.)

These behaviors match almost precisely those that the Third Circuit noted in *Lopez*. It was late at night, and a law enforcement officer saw individuals checking their surroundings for police before engaging in a hand-to-hand transaction. *See Lopez*, 441 F. App'x at 913; (Hearing Tr. p. 7-12.) Though some of these elements individually might be innocent, when taken together they support the inference that a reasonable law enforcement officer would have believed criminal activity was afoot. *See Lopez*, 441 F. App'x at 913. As such, the stop of Jn-Baptiste by VIPD, though a seizure, was reasonable within the meaning of the Fourth Amendment.

Following their stop of Jn-Baptiste, VIPD proceeded to conduct a pat-down search. As this is another level of intrusion, the Court must determine if such an intrusion was reasonable.

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 11

A frisk or pat-down "may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures if two conditions are met. First, the investigatory stop (temporary detention) must be lawful . . . Second, to proceed from a stop to a frisk (patdown for weapons), the officer must reasonably suspect that the person stopped is armed and dangerous*." Arizona v. Johnson*, 555 U.S. 323, 323 (2009). The reasonable belief that someone is dealing drugs can support the suspicion that the individual is armed. *United States v. Sanchez*, 398 F. App'x 840, 843 (3d Cir. 2010) (quoting *United States v. Anderson,* 859 F.2d 1171, 1177 (3d Cir.1988))( "[The Third Circuit has] upheld a safety frisk where an officer suspected the defendants were engaged in drug trafficking and became concerned for his safety because persons involved with drugs often carry weapons.").

In considering whether a belief that an individual is armed is reasonable, "[w]e perform that assessment objectively, focusing on whether the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief that the action taken was appropriate. Subjective motive or intent is not relevant for Terry purposes." *United States v. Pittman*, 338 F. App'x 147, 149 (3d Cir. 2009).

Here, the officers were engaging with Jn-Baptiste because they had reasonable suspicion that he was dealing narcotics.

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 12

This reasonable suspicion that the defendant was dealing drugs

supports a reasonable suspicion that Jn-Baptiste was armed. *See*

*Sanchez*, 398 F. App'x at 843.

Jn-Baptiste argues that, even if a *Terry* frisk was

reasonable in this instance, the search performed exceeded the

bounds of *Terry*. Specifically, he asserts that it was

unreasonable for Serrano to search the multi-colored zippered

pouch, because it should have been apparent there was no weapon

inside of the pouch.

> Assuming that an officer is authorized to
> conduct a *Terry* search at all, he is authorized
> to assure himself that a suspect has no
> weapons. He is allowed to slide or manipulate
> an object in a suspect's pocket, consistent with
> a routine frisk, until the officer is able
> reasonably to eliminate the possibility that the
> object is a weapon. . . . If, however, the
> officer goes beyond what is necessary to
> determine if the suspect is armed, it is no
> longer valid under *Terry* and its fruits will be
> suppressed.

*United States v. Yamba*, 506 F.3d 251, 259 (3d Cir. 2007). Such

a search may include the search of a container or bag held by

the suspect, where such places could be used to conceal a

weapon. *See, e.g.*, *United States v. Hernandez-Mendez*, 626 F.3d

203, 213 (4th Cir. 2010)(finding reasonable the search of a

woman's purse held by defendant); *United States v. Edwards*, 53

F.3d 616, 618-19 (3d Cir. 1995)(finding it reasonable to search

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 13

a bulky envelope for weapons). When it becomes reasonably

apparent that the suspect is not armed, a *Terry* frisk should

cease. *See United States v. Johnson*, 452 F. App'x 219, 226 (3d

Cir. 2011).

The Third Circuit has previously had cause to consider the

legality of a container search under *Terry*. In *United States v.*

*Edwards*, 53 F.3d 616 (3d Cir. 1995), police searched a defendant

suspected of credit card fraud. During the pat-down search of

the suspect, officers felt a "large, hard, bulky object." *United*

*States v. Edwards*, 53 F.3d 616, 618 (3d Cir. 1995). The officers

removed the object from the suspect, and determined it was a

manila envelope that was folded once in half and unsealed. *Id*.

The officer unfolded the envelope, and looked inside of it for a

weapon. *Id*. Instead of a weapon, the officer found credit cards

and drivers licenses later determined to be fraudulent. *Id.*

The Third Circuit stated that

> Officer Crapello was within the bounds of Terry
> in opening the envelope because he was
> justifiably concerned that it concealed a small-
> caliber handgun. . . . The four-by-six inch
> envelope was packed full of nineteen hard
> plastic cards—whether credit cards or drivers'
> licenses—which the record demonstrates created
> the feel of a hard, bulky object. . . . In the
> hasty examination necessitated by a protective
> search, Officer Crapello could reasonably have
> confused the square, bulky mass of credit cards
> and drivers' licenses for a small handgun

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 14

> sheathed in a square, leather holster that
> masked its outlines.

*Id.* at 619.

Similarly, in *United States v. Muhammad*, 604 F.3d 1022 (8th Cir. 2010), the Eighth Circuit considered whether the search of a container on the suspect's person was permissible under *Terry*. In *Muhammad*, two Federal Bureau of Investigation Special Agents approached Muhammad, who was suspected to have assisted in a recent bank robbery. *United States v. Muhammad*, 604 F.3d 1022, 1024-25 (8th Cir. 2010). One of the agents handcuffed Muhammad, and then performed a pat-down search. *Id.* During the pat-down, the agent felt a "hard object approximately four inches long and three inches wide in the back pocket of Muhammad's pants. He asked Muhammad what the object was, and Muhammad stated that it was his wallet." *Id.* The agent pulled the object out, and it turned out to be a bi-fold leather wallet bulging with cash. *Id.* The agent seized the cash, and matched bills in Muhammad's wallet to recorded serial numbers from the bank robbery. *Id.*

The Eighth Circuit found that

> Agent McCrary then reasonably determined that
> the four-inch long and three-inch wide "hard
> object" in Muhammad's back pocket could be a
> weapon or could conceal a weapon that presented
> a threat to officer safety, such as a knife, box
> cutter or razor blade. An objectively reasonable
> officer in Agent McCrary's situation would not
> be required to blindly accept Muhammad's

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 15

> assertion that the object he felt was a wallet
> rather than a weapon or an object that could
> conceal a weapon. *See Terry*, 392 U.S. at 23, 88
> S.Ct. 1868 ("[I]t would be unreasonable to
> require that police officers take unnecessary
> risks in the performance of their duties.").
> Indeed, a dangerous weapon such as a small
> knife, box cutter or razor blade could have been
> concealed in the wallet itself. Accordingly,
> this pat-down search stayed within the bounds of
> Terry, and the Fourth Amendment permitted Agent
> McCrary to remove the object from Muhammad's
> pocket.

*Id.* at 1027.

As in *Muhammad* and *Edwards*, the while conducting the frisk of Jn-Baptiste, Serrano felt a "hard bulge" in Jn-Baptiste's pocket. Serrano testified that he could not tell what was inside. Thereupon, Serrano removed the object from Jn-Baptiste, and revealed it was a multi-colored pouch. The pouch was not a hard case, instead it was made of cloth that was coated with plastic. A photograph of the pouch, submitted by the United States, shows that it is perhaps three inches by five inches and made of a stiff textile. Serrano testified that even after removing the pouch, manipulating the pouch did not reveal its contents. Specifically, Serrano stated that he tried to "squeeze[] the bag to see if [he] could feel the shape of any weapon or anything. And [he] couldn't feel anything exactly, so [he] opened it up to see through a visual inspection." (Hearing Tr. p. 75.)

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 16

    Serrano attributed his inability to feel what might be inside the pouch to how full the pouch was.  The Court's only information regarding how full the pouch was, and thus its texture, is the testimony of Serrano and a photograph taken after some bags of marijuana had been removed.[1] Regardless of the cause, Serrano testified that he was unable to determine what was inside the pouch. (Id. p. 77.)

    The record demonstrates that the pouch was large enough to have contained a small weapon, such as a knife.  It further demonstrates that the contents of the pouch could not be fully felt by manipulating it, due to the fullness of the pouch. As a result, a reasonable officer, at the time, may still have been unable to discern whether the pouch contained a weapon.  Like in *Edwards* and *Muhammad*, even where there were plausible explanations for the searched container that were not dangerous to police officers, the officers were entitled to search the container until satisfied it could not contain a weapon. In this case, Serrano could not discern that there was no weapon in the pouch until opening it.  As such, the search of the pouch was permissible under *Terry*.

---

[1] This is evident because some bags are sitting outside of the pouch in the photograph.

Following the discovery of the marijuana, the government had probable cause to effect an arrest.  VIPD did so, arresting Jn-Baptiste at that time and then performing a second search.

> The prevailing rule under the Fourth Amendment that searches and seizures may not be made without a warrant is subject to various exceptions.  One of them permits warrantless searches incident to custodial arrests, and has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained.

*United States v. Edwards*, 415 U.S. 800, 802-03 (1974)(internal quotations omitted).  A legal search incident to arrest is limited to the arrestee's person and to the area within his immediate control, from which he might gain possession of destructible evidence.  *See United States v. Myers*, 308 F.3d 251, 267 (3d Cir. 2002).

During VIPD's second search of Jn-Baptiste's person, they seized a small, black pouch containing a substance that field-tested positive for cocaine and several hundred dollars in cash.  As these items were on Jn-Baptiste's person, they were "in the area within his immediate control."  *Id.*  Furthermore, such objects might have been destroyed or discarded.  As such, the search and seizure incident to Jn-Baptiste's arrest complied with the Fourth Amendment.

*United States v. Jn-Baptiste*
Crim. No. 2014-42
Order
Page 18

The premises considered, it is hereby

**ORDERED** that defendant Jn-Baptiste's motion to suppress is

**DENIED.**

                                        S_____
                                             **Curtis V. Gómez**
                                             **District Judge**